**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>**This Order Relates To**<br>*Dorene Dairy Gen. P'Ship*, 2:20-cv-04263-RMG;<br>*Schaap*, 2:19-cv-03288-RMG;<br>*Teune*, 2:19-cv-3290-RMG;<br>*Vander Dussen*, 2:20-cv-04191-RMG;<br>*New Mexico*, 2:20-cv-02115-RMG |

This matter is before the Court on the United States of America's motion to dismiss claims related to New Mexico's Cannon Air Force Base ("CAFB"). (Dkt. No. 4551). The Government brings this motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Plaintiffs at issue in the Government's motion are four dairy farms located to the south and southeast of CAFB (the "Dairy Plaintiffs") and the State of New Mexico. Plaintiffs jointly responded in opposition to the Government's motion. (Dkt. No. 4851), and the Government replied (Dkt. No. 5662). The Court held a hearing on the Government's motion, and it is now ripe for review. (Dkt. Nos. 6661, 6677). For the reasons set forth below, the Court grants-in-part and denies-in-part the Government's motion to dismiss.

I.    **Background**

   A. **Highland Dairy**

Mr. Schaap and his wife own and manage Highland Dairy located adjacent to CAFB's southeastern corner. (Dkt. No. 4851-20, ¶¶ 2-3). Mr. Schaap is a third-generation dairy farmer and

1

founded Highland Dairy in 1992. (*Id.*, ¶ 3). By the mid-90s, Highland Dairy had grown into one of the top milk producing dairies in New Mexico. (*Id.*, ¶ 9).

In 2018, the Schaaps learned that their dairy was contaminated with per- and polyfluoroalkyl substances ("PFAS") that originated from Aqueous Film Forming Foam ("AFFF") use at CAFB. (*Id.* at 43). The Schaaps received a letter from CAFB showing test results that the drinking water in their wells contained a concentration of two PFAS substances, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), greatly exceeding the then-regulatory advisory level of 70 parts per trillion ("ppt"). (*Id.*) Two sites were tested on Highland Dairy. (*Id.*) Site 1, which provided drinking water for the Schaaps' more than 4000 cows, had a combined PFOA-PFOS concentration of 1,649 ppt. (*Id.*, ¶ 20) Site 2, which was the drinking water at the Schaaps' kitchen tap, had a combined PFOA-PFOS concentration of 671 ppt. (*Id.*) These results were more than 23 times and 9 times the 2016 Environmental Protection Agency's ("EPA") Lifetime Health Advisory ("LHA") of 70 ppt. (*Id.*)

The contamination had devastating consequences for Highland Dairy. After learning of the contamination, the dairy's milk purchasers cancelled their sales contracts, and the New Mexico Department of Agriculture revoked the dairy's Grade-A Permit for milk production. (*Id.*, ¶¶ 34-47). State and federal regulators eventually determined that Highland's cattle were not suitable for food and placed the dairy under strict orders not to enter the beef or milk into the food supply. (*Id.*, ¶¶ 45-51). The quarantined cows progressively became ill and began dying at an increasing rate. (*Id.*, ¶ 20). Maintaining the health and safety of the cows began to overburden the Schaaps despite receiving government compensation for PFAS-related loses through participation in a federal indemnity program. (*Id.*, ¶¶ 52-65).  Regulators eventually allowed the Schaaps to kill the

surviving cows in April 2022. (*Id.*, ¶ 78). As of April 15, 2024, the date of Mr. Schaap's affidavit, 3,665 cow carcasses were composting in a designated trench on the Schaap's dairy. (*Id.*, ¶ 89).

**B. History of AFFF Use at CAFB**

AFFF containing PFAS was introduced at CAFB in 1970 for use in live firefighting scenarios, response actions to flightline aircraft crashes, firefighting training exercises, and fire-suppression systems installed in hangars and maintenance facilities. (Dkt. No. 4851-5, ¶ 25).

CAFB continued using AFFF for these purposes for decades. (*Id.*, ¶ 14). For example, from 1970 to 1985, fire training at CAFB was conducted multiple times per year in an unlined pit. (Dkt. No. 4551-7 at 36-38). The exercise required igniting a mock jet fuselage with 300 gallons of jet fuel and using AFFF to extinguish the fire. (*Id.*) In 1985, CAFB began using lined pits in their fire training areas and switched from using jet fuel to propane to fuel the fires but continued using AFFF until 2011 when it was voluntarily discontinued for fire training activities. (*Id.*) Additionally, AFFF was used in fire-suppression systems in hangars at CAFB until 2016 and is still authorized for use today in fire emergency situations. (*Id.* at 17; Dkt. No. 4548-49, ¶ 17).

Since the early 1990s, numerous accidental discharges and spills of AFFF were documented at CAFB. (*Id.* at 17-18). These accidental discharges were due to system malfunctions and operational errors. (*Id.*) The first recorded spill occurred on June 29, 1994, from Hangar 199, marking the beginning of what would become a long history of accidental AFFF releases. (*Id.*) Other notable incidents include four separate hangar activations due to portable generators being started too close to hangars equipped with AFFF suppression systems; a foam release caused by an individual grabbing onto and breaking an AFFF pipe in an attempt to keep himself from falling off a platform; and a foam release resulting from the accidental closure of the pressure release

valve on an AFFF tank. (Dkt. Nos. 6621-23, 6621-4, 6621-13). Some statistics show that over forty percent of activations are caused by human error. (Dkt. No. 6677 at 64).

In total, between 1994-2020, CAFB experienced at least forty-five accidental discharges of AFFF, leading to the release of more than 4,500 gallons of AFFF across CAFB. (Dkt. No. 4851-5 at 17-18). These incidents resulted in direct contamination of soil, stormwater, and CAFB's sanitary sewer system, leading to visible foam pollution in North Playa Lake, CAFB's wastewater discharge site located in the east-central part of the base. (*Id.* at 38-42).

Despite these incidents, CAFB continued using AFFF until 2018, when an investigation revealed that PFAS levels in CAFB's soil, surface water, and groundwater greatly exceeded the EPA's LHA of 70 ppt. (Dkt. No. 4851-5, ¶ 14; Dkt. No. 4851-8 at 64-65).

### C. Efforts to Investigate and Contain Contamination

The environmental impact of contaminants at CAFB had been a concern since the late 1980s. Investigations have documented the migration of surface contaminants into groundwater, leading to regulatory actions and policy changes aimed at mitigating pollution. This timeline outlines key developments in the identification and management of contamination at CAFB.

#### 1. Early Investigations and Groundwater Concerns

By the late 1980s, investigations at CAFB began revealing the potential environmental consequences of contaminants at CAFB. (Dkt. No. 4851-5, ¶ 21). A 1988 Resource Conservation and Recovery Act (RCRA) facility investigation noted that the groundwater gradient beneath CAFB flowed east and southeast towards the dairies and that the groundwater beneath CAFB is potentially a source for drinking water. (*Id.*)

In 1994, the United Staes Air Force issued Air Force Instruction 32-7041, which mandated strict compliance with federal, state, and local water quality regulations. (Dkt. No. 4851-31). The

4

policy also emphasized the need to prevent and control pollution on Air Force installations. (*Id.* at 16). It required new fire training facilities to operate as "zero discharge facilities," new facilities to protect ground water, and required Air Force bases to take all steps to abate, prevent, and control environmental pollution on Air Force installations. (*Id.* at 17).

By 1995, CAFB knew that surface contaminants at CAFB had migrated to the groundwater and that the groundwater flow was southeast across the base towards the dairies. (Dkt. No. 4851-2, ¶¶ 8, 21, 24).

## 2. Policy Developments for AFFF

In 1997, the United States Army Corps of Engineers issued a technical letter titled "Containment and Disposal of Aqueous Film-Forming Solution." (Dkt. No. 4548-85 at 4). The letter provided guidance on containment systems for fixed AFFF fire extinguishing systems for use in the planning, design, and construction of new facilities. (*Id.* at 4-5). The letter listed several options for AFFF containment systems, including underground tanks; aboveground tanks with pumps; earthen retention ponds; and containment trenches, but also noted that designers are encouraged to consider other innovative methods and systems as may be deemed appropriate for each specific application. (*Id.* at 14-17). The letter also identified several AFFF disposal and treatment options, including discharge to a wastewater treatment plant, discharge to flowing sewers, and, "as a last resort," transport to off-site treatment facility. (*Id.* at 17-19). The letter specifically noted "[w]hen too much fire fighting foam . . . is discharged to a wastewater treatment system at one time, severe foaming can occur, even at low concentrations." (*Id.* at 18). The letter stated that this type of excessive foaming "results in aesthetic concerns in rivers and streams as well as operational problems in sewers and wastewater treatment systems." (*Id.*)

### 3. Infrastructure and Regulatory Oversight

In 1998, CAFB completed construction of its wastewater treatment plant ("WWTP"). (Dkt. No. 4851-5, ¶ 28). Once the WWTP was complete, sanitary and industrial wastewater was sent to the WWTP for treatment before being discharged to the North Playa Lake. (*Id.*) The WWTP was not designed to treat AFFF or otherwise reduce the concentrations of PFAS in AFFF. (*Id.*)

In June 2000, the EPA issued a permit pursuant to the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") that imposed certain requirements on CAFB concerning the operation of the WWTP and the quality of its effluent discharges to the North Playa Lake. (*Id.*, ¶ 29). The permit required that there be "no discharge" of treated effluent from the WWTP containing "visible foam in other than trace amounts." (*Id.*)

### 4. Operational Changes at CAFB

On June 1, 2002, the CAFB Commander issued Operating Instruction ("OI") 32-11 for hangar firefighting foam activations. (Dkt. No. 4851-7 at 124). The stated purpose of OI 32-11 was to "establish policy and guidance associated with the release of AFFF" in order to minimize or eliminate environmental consequences. (*Id.*) The primary directive in OI 32-11 stated that, when responding to releases from hangar suppression systems, "AFFF must be kept out of storm drain inlets and the sanitary sewer system." (*Id.* at 125). "All personnel [were] responsible directly to their flight commanders for the enforcement of [the] OI." (*Id.*) The primary directive and enforceability of the OI remained unchanged when new versions of OI 32-11 were adopted by CAFB in 2006 and 2014. (Dkt. No. 4851-7 at 67, 116).

### 5. PFAS Contamination Investigations

In 2015, the Air Force began a Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") Preliminary Assessment into PFAS contamination at CAFB and issued its findings in a Preliminary Assessment Report. (Dkt. No. 4851-6 at 5). The Preliminary

Assessment identified several sites across CAFB as potential AFFF release areas and recommended initiating CERCLA Site Inspections at those sites. (*Id.* at 91-92).

In 2016, the EPA published its LHA of 70 ppt for either PFOA or PFOS, or as combined concentration when both chemicals are present. (Dkt. No. 4851-17 at 299).

In August 2018, the Air Force issued inspection results of the sites identified by the 2015 Preliminary Assessment. (Dkt. No. 4851-8 at 2). The CERCLA Site Inspections revealed that PFAS levels in CAFB's soil, surface water, and groundwater greatly exceeded the EPA's LHA. (Dkt. No. 4851-5, ¶ 14; Dkt. No. 4851-8 at 64-65). Specifically, the investigation revealed that the groundwater at the Base had a combined PFOS-PFOA concentration more than 374 times the EPA standard of 70 ppt. (Dkt. No. 4851-8 at 65 (showing a screening value of 0.07 µg/L for combined PFOS-PFOA in groundwater and a combined PFOS-PFOA concentration of 26.2 µg/L in the groundwater at the Base)). An addendum to the 2018 investigation "confirm[ed] that groundwater impacted with PFAS concentrations above the LHA has migrated off-base to the southeast." (Dkt. No. 4551-25 at 9-10 (showing a combined PFOS-PFOA concentration of 1.649 µg/L at the off-base survey area)).

## 6. Public Disclosure

In October 2018, the New Mexico Environmental Department announced wells outside the base were contaminated with PFOA and PFOS. (*Art Schaap, et al. v. United States et al.*, No. 2:19-cv-03288-RMG, Dkt. No. 1, ¶ 59).

## 7. Current Cleanup Efforts

Based on the 2018 CERCLA Site Inspections, the Air Force determined that a Remedial Investigation and Feasibility Study ("RI/FS") was required at CAFB. (Dkt. No. 4548-47, ¶ 39). The RI/FS Phase of CERCLA includes a sampling and analysis program to determine the nature

and extent of contamination, a baseline ecological risk assessment, and a human health risk assessment. The Air Force began the RI/FS process in August 2020 and is scheduled to complete it in August 2026. (*Id.*)

The Air Force has undertaken additional efforts to control PFAS migration at CAFB. (*Id.*, ¶ 41). The Air Force has implemented a pilot study designed to investigate treatment technologies and to reduce the potential for off-base migration of PFAS adjacent to the fire training pit. (*Id.*) This study involves the construction of two full-scale groundwater treatment systems which will be used to test treatment technologies and subsequently intercept and capture PFAS-impacted water. (*Id.*, ¶¶ 41-42). Both of those facilities are expected to cost a combined $50,000,000.

Overall, the Air Force has spent or is obligated to spend $67,379,000 to investigate and perform removal actions to respond to PFAS releases at CAFB through the 2023 fiscal year. (*Id.*, ¶ 43). This includes over $10,000,000 obligated for the CERCLA RI/FS. (*Id.*) The estimated obligations for PFAS investigation and cleanup beyond 2023 are $44,670,000.

### D. Operating Instruction 32-11

As mentioned above in the timeline, OI 32-11 was issued in June 2002. OI 32-11 is significant as it is the only mandatory policy governing the use of AFFF at CAFB. It therefore plays a critical role in the Court's discretionary function analysis below, particularly concerning prong one, which asks whether the Government's action involves an element of judgment or choice. The Court finds that both the language of OI 32-11 and the events leading to its implementation are important for its analysis.

#### 1. Key Provisions

As stated earlier, OI 32-11 was implemented "to establish policy and guidance associated with the release of AFFF" in CAFB's hangars. (Dkt. No. 4851-7 at 124). The OI "addresse[d]

environmental concerns and ramifications, if any, with AFFF releases and provide[d] guidance to minimize or eliminate environmental consequences." (*Id.*) The OI stated that "AFFF entering the sanitary sewer system can upset the biological treatment process of the Cannon wastewater treatment plant (WWTP) due to its foaming characteristic," which could "lead to water quality limits, specifically total suspended solids and biochemical oxygen demand, associated with the wastewater NPDES permit being exceed." (*Id.*) The OI further stated that "[o]f greater concern, foam may be discharged in the final effluent; thus violating the permit." (*Id.*)

Under a section titled "POLICY," the OI stated that "[g]enerally, AFFF must be kept out of storm drain inlets and the sanitary sewer system." (*Id.* at 126). A decision matrix regarding disposal of AFFF prohibited AFFF from entering storm drains of certain hangars and prohibited AFFF entering the sanitary sewer system for all hangars except under mission permitting conditions. (*Id.* at 128).

OI 32-11 applied to both military and civilian personnel responsible for environmental compliance, firefighting, and operations, and it required all personnel to be directly accountable to their flight commanders for enforcement. (*Id.* at 124).

### 2. Events Leading to the Issuance of OI 32-11

The issuance of OI 32-11 was driven by a series of environmental incidents, institutional resistance, and mounting regulatory pressure to address AFFF contamination. The need for a formal directive emerged as efforts to prevent AFFF releases through informal guidance and internal communications proved ineffective.

The multiple AFFF discharges in the late 1990s and early 2000s underscored the urgency of implementing strong controls. Notable incidents included a June 1998 leak that released 1,000 gallons of AFFF over 48 hours into the sewer system (Dkt. No. 4851-6 at 66) and a July 2001

power outage that resulted in 200 gallons of AFFF being discharged into floor trenches and soil (Dkt. No. 6621-4 at 3). These releases had visible environmental consequences, including foaming in North Playa Lake and wastewater treatment plant disruptions. (*Id.*)

Efforts to curb AFFF discharges gained momentum in 2000 when a civilian employee serving as the water quality program manager, John Rebman, began pushing for a formal policy. On December 20, 2000, Mr. Rebman wrote an email subjected "AFFF Concerns" where he warned of a slow, undetected AFFF leak at Hangar 197 that had likely persisted for an extended period. (Dkt. No. 6621-20). He highlighted that AFFF entering the WWTP was causing problems with its operation and that it could eventually result in suspended solids being decanted to the North Playa Lake—"a big no-no." (*Id.*) Mr. Rebman asked his colleagues to help keep AFFF out of the sanitary sewer system and told them that he is working on an operating instruction and that he hoped to have a draft copy in early January. (*Id.*) Two days later, Mr. Rebman sent another email subjected "Evidence of AFFF Impacts" where he noted "the problems AFFF has on wastewater biological treatment." (Dkt. No. 6621-22). Specifically, Mr. Rebman outlined how AFFF caused a spike in Total Kjeldahl Nitrogen levels beyond regulatory limits. (*Id.*) In an effort to stay in compliance with state limits, Mr. Rebman stated he would recommend a plan to keep AFFF out of the WWTP and tell state regulators that AFFF will no longer be placed in the sanitary sewer system. (*Id.*)

Despite these concerns, resistance from command leadership delayed the adoption of an operating instruction. In March 2001, a major leak occurred because a generator was placed too close to an AFFF fire suppression system. (Dkt. No. 6621-23). On March 8, 2001, CAFB Commander, Nicholas Desport, issued a memo acknowledging that "[p]reventable AFFF releases into the sanitary sewer and storm water systems have profound impacts on Cannon's wastewater treatment plant and ecosystem [and s]uch impacts could violate two permits issued by the US

Environmental Protection Agency and A Discharge Plan issued by the New Mexico Environment Department." (Dkt. No. 6621-3). The Commander further warned that such discharges could result in enforcement actions from the EPA and NMED. (*Id.*)

Over the next year, additional incidents reinforced the need for stronger regulations at CAFB. In July 2001, Mr. Rebman reported that excessive AFFF had entered the WWTP and suggested that he "dust[] off" his draft OI that had been previously proposed but not implemented. (Dkt. No. 6621-24). A few days later, another spill resulted in foaming in North Playa Lake, requiring a formal report to the EPA for noncompliance. (Dkt. No. 6621-4 at 3).

In May 2002, Mr. Rebman attempted to revive his OI proposal, reporting another unreported AFFF release at Hangar 204. (Dkt. No. 6621-26). He expressed frustration that leadership had previously dismissed his attempts to implement the policy but resolved to keep "pushing the OI." (*Id.*)

Ultimately, the continued spills, potential for regulatory violations, and Mr. Rebman's persistence led to the CAFB Commander issuing OI 32-11 on June 1, 2002. (Dkt. No. 4851-7 at 124). The CAFB Commander required all personnel to be responsible to their flight commanders for enforcement of the OI. (*Id.*)

### E. Procedural History

The Judicial Panel on Multidistrict Litigation centralized in this Court cases involving claims that AFFF had contaminated local ground water and drinking water supplies in communities across the Untied States. This Multi-District Litigation ("MDL") now contains over eight thousand pending actions.

The United States is a defendant in at least thirty cases in this MDL. The cases generally allege that the United States military's use and handling of AFFF at specific military installations,

11

primarily Air Force bases, contaminated nearby water and land with PFAS. Twenty-seven of the cases pending against the United States bring claims under the Federal Tort Claims Act ("FTCA"). Seven cases assert claims for injunctive relief seeking to compel the United States to investigate and remediate PFAS contamination from a total of nine specific facilities. The United States sought a global resolution of these claims by arguing that any claims under the FTCA are barred under the Discretionary Function Exception and that any claims for injunctive relief are barred by CERCLA Section 113(h).

To determine whether global resolution of the Government's arguments was appropriate, the Court requested site-specific briefing, leading to the Plaintiff's Executive Committee ("PEC") choosing CAFB for the site-specific briefing. There are five cases associated with CAFB, the four cases involving the neighboring dairy farms and the case brought by the State of New Mexico.

Alleging that their properties were contaminated with PFAS because of CAFB's use and handling of AFFF, the Dairy Plaintiffs sued the Government under the FTCA for (1) negligence, (2) failure to warn, (3) private nuisance, and (4) trespass. (*Art Schaap, et al. v. United States et al.*, No. 2:19-cv-03288-RMG, Dkt. No. 1, ¶¶ 218-30, 240-51, 272-95; *DoRene Dairy Gen P'ship et al. v. 3M Co. et al.*, No. 2:20-cv-4263-RMG, Dkt. No. 1, ¶¶ 94-166; *Teune et al. v. United States et al.*, 2:19-cv-3290-RMG, Dkt. No. 1, ¶¶ 223-35, 245-56, 268-300; *Vander Dussen et al. v. 3M Co. et al.*, No. 2:20-cv-04191-RMG, Dkt. No. 1, ¶¶ 223-35, 245-56, 268-300).

New Mexico asserted claims for injunctive relief under the New Mexico Hazardous Waste Act ("NMHWA") and the Resource Conservation and Recovery Act ("RCRA") based on allegations that the Government improperly disposed of and unlawfully failed to contain the hazardous components of AFFF at CAFB. (*New Mexico v. United States et al.*, 2:20-cv-02115-RMG, Dkt. No. 115, ¶¶ 219-234).

The United States filed a site-specific motion to dismiss the Diary Plaintiffs' tort claims and New Mexico's claims seeking injunctive relief. (Dkt. No. 4551). The United States argues that the Court lacks subject matter jurisdiction over the Dairy Plaintiffs' tort claims because the Discretionary Function Exception of the FTCA applies to the alleged Government actions on CAFB. (*Id.*). And the United States argues that the Court lacks subject matter jurisdiction over New Mexico's claims seeking injunctive relief because CERCLA Section 113(h) bars those claims. (*Id.*).

The motion has been fully briefed, argued before the Court, and is ripe for review.

## II.     Federal Rule of Civil Procedure 12(b)(1) Standard

The Government's motion is a 12(b)(1) motion for lack of subject matter jurisdiction.

A defendant may challenge subject matter jurisdiction in one of two ways. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). First the defendant may contend "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* When a defendant makes a facial challenge to subject matter jurisdiction, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.* In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction. *Id.*

In the alternative, the defendant can contend "that the jurisdictional allegations of the complaint [are] not true." *Id.* The plaintiff in this latter situation is afforded less procedural protection: if the defendant challenges the factual predicate of subject matter jurisdiction, a trial court may then go beyond the allegations of the complaint and determine if there are facts to support the jurisdictional allegations without converting the motion to a summary judgment proceeding. *Id.* In that situation, the presumption of truthfulness normally accorded a complaint's

allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction. *Id.*

The Court need not resolve all factual disputes when the jurisdictional facts and the facts central to a tort claim are inextricably intertwined. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009). When jurisdictional facts and facts central to a tort claim are inextricably intertwined, "a trial court should dismiss under Rule 12(b)(1) only when the jurisdictional allegations are clearly immaterial and made solely for the purpose of obtaining jurisdiction." *Kerns v. U.S.*, 585 F.3d 187, 192 (4th Cir. 2009). Indeed, in all situations, the Court should grant a Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

## III.  Discussion

The Court addresses the Government's FTCA and CERCLA arguments in turn below.

### A.  Federal Tort Claims Act Discretionary Function Exception

The Government asserts that the Discretionary Function Exception to the FTCA's waiver of sovereign immunity applies and precludes subject matter jurisdiction over the Dairy Plaintiffs' tort claims. The Court agrees as to the Dairy Plaintiffs' failure to warn claims, but not as to Plaintiff's negligence, trespass, and private nuisance claims.

#### 1.  FTCA Legal Standard

The FTCA does not provide for a complete waiver of the federal government's sovereign immunity. The liability of the United Staes under the FTCA is subject to the exceptions contained in 28 U.S.C. § 2680, which includes the Discretionary Function Exception at issue here. The Discretionary Function Exception provides that the government is not liable for

> [a]ny claim based upon an act or omission of an employee of the
> Government, exercising due care, in the execution of a statue or
> regulation, whether or not such statute or regulation be valid, or
> based upon the exercise or performance or the failure to exercise or
> perform a discretionary function or duty on the part of a federal
> agency or an employee of the Government, whether or not the
> discretion involved be abused.

28 U.S.C. § 2680(a).

Courts employ a two-part test for applying the discretionary function exception. First, we ask whether the act "involv[es] an element of judgment or choice." *U.S. v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988)). "[I]f a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,'" there is no judgment or choice involved. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). Second, when the challenged conduct is the product of judgment or choice, the court must still determine whether the decision made was "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. This second step of the analysis is designed to prohibit courts from "second guessing" decisions "grounded in social, economic, and political policy through the medium of an action in tort." *Gaubert*, 499 U.S. at 323 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). And in this same vein, "when established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently." *Wood v. United States*, 845 F.3d 123, 127 (4th Cir. 2017).

## 2.  Failure to Warn Claims

The Dairy Plaintiffs do not assert that a specific policy required the Government to warn them earlier than 2018 and do not contend that the decision to warn does not involve an element of judgment or choice. The Dairy Plaintiffs instead argue that failing to warn of long-standing hazards is not susceptible to policy considerations as required by step two of the Discretionary Function Exception.

Courts have frequently found that "the [G]overnment's decision whether to warn about the presence of toxins, carcinogens, or poisons falls under the discretionary function exception to the [Federal Tort Claims Act]'s waiver of sovereign immunity. *Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 101-02 (1st Cir. 2012) (collecting cases in which other circuits have held that the decision whether to issue a warning fell within discretionary-function exception.). "[T]he decision to warn is replete with choices and requires ascertaining the need for a warning and its cost, determining the group to be alerted, as well as the content and procedure of such notice, and ultimately, balancing safety with economic concerns." *Clendening v. United States*, 19 F.4th 421, 435-36 (4th Cir. 2021). (internal quotations omitted). "[W]here the Government has provided some warning or disclosure, the decision not to provide additional, earlier, or more urgent warnings may more clearly indicate the existence of policy choices than would a failure to provide any warning at all." *Id.* at 436 (citing *Clark v. United States*, 695 Fed. App'x 378, 388 (10th Cir. 2017)).

The Fourth Circuit recently addressed the Discretionary Function Exception for a claim that the Government failed to warn about the presence of toxins. *See Clendening*, 19 F.4th at 432-36. In *Clendening*, a solider stationed at Camp Lejeune in the early 1970s was exposed to hazardous drinking water on a military base during his military service, causing cancer that manifested after his military service and ultimately led to the soldier's death. *Id.* at 425.

16

Throughout the 1980s, the Government discovered hazardous material near where the solider was stationed and throughout the drinking wells of the base. *Id.* Despite being aware, the Government took no action to inform exposed personnel in the 80s. *Id.* It wasn't until 1997 when the Agency for Toxic Substances and Disease Registry published a Public Health Assessment for Camp Lejeune. *Id.* at 426. That assessment was taken down from the Agency for Toxic Substances' website in 2009. *Id.* In 2011, the Government directed the Agency for Toxic Substances to survey former Camp Lejeune employees' health conditions. *Id.* In 2012, the Agency for Toxic Substances released a new report discussing the contamination of the water at Camp Lejeune indicating that harmful chemicals were found on the base and in the base's water treatment plant. *Id.* at 436.  In 2016, thirty years after it first discovered hazardous conditions, the Government finally adopted regulations stating that eight associated diseases were presumed to have been caused by exposure at Camp Lejeune. *Id.* The soldier's estate sued the military both for the initial exposure to the chemicals that caused the cancer and for the military's failure to warn the solider about the risk of cancer which delayed the soldier's discovery and treatment of his cancer. *See id.* at 425. The trial court dismissed all the estate's claims. *Id.* at 426.

The Fourth Circuit affirmed the trial court and found that the soldier's failure to warn claim was barred by the Discretionary Function Exception because the military was not required by law to warn the solider of the risk of cancer and because the decision not to warn the solider required the military to weigh several public policy factors. *See id.* at 432-36. The court reasoned that, to issue a warning, the Government would have had to "evaluate available information assess the sufficiency and reliability of evidence, resolve conflicting data, determine the overall nature of any health threats, consider how to identify potentially exposed individuals, decide what type of medium or combinations of mediums would be the best way to convey the risk to those exposed,

17

and weigh practicality and economic constraints." *Id.* at 436 (internal quotations and citations omitted). Those decisions, the court stated, implicate public policy, health, and safety concerns. *Id.* The court further reasoned that because the Government did provide some warnings its decision to not issue earlier warnings were likely due to policy decisions. *Id.*

The Dairy Plaintiffs' failure to warn claims are similarly subject to the Discretionary Function Exception. To issue a warning to the dairies, CAFB would likely consider the reliability of the PFAS contamination evidence, the nature of the threats to the dairies, decide how to best convey the risk of PFAS contamination to the dairies, and weigh other practical and economic concerns. Additionally, the Government first learned of PFAS contamination related to CAFB's AFFF use in 2015 and directly notified the Dairy Plaintiffs of the contamination just three years later in 2018. [1] The 2018 letters stated the combined PFOA-PFOS concentration and indicated that the levels were above the EPA's LHA. The fact that the Government did indeed provide the Dairy Plaintiffs warnings in 2018 suggests its decision not to issue earlier warnings may very well have been due to any of the policy decisions discussed above.

Because we find the Discretionary Function Exception to the Federal Tort Claims Act applies to the Dairy Plaintiff's failure to warn claims, the Court grants the Government's motion to dismiss those claims.

### 3. Negligence, Trespass, and Private Nuisance Claims

Dairy Plaintiffs argue that the Discretionary Function Exception does not apply to their claims related to violations of OI 32-11 because OI 32-11 was a mandatory directive prohibiting AFFF from entering CAFB's sanitary sewer system. The Dairy Plaintiffs also argue that the

---

1 This stands in stark contrast to the 17-year gap between the Government first learning about hazardous material at Camp Lejeune and publishing its first health assessment. The Government here provided far more adequate and timely warnings than the Government did in Clendening.

Discretionary Function Exception does not apply to negligent AFFF releases at CAFB. The Court addresses both arguments in turn below.

### a. Violations of OI 32-11

Dairy Plaintiffs argue that their claims related to violations of OI 32-11 are not barred by the Discretionary Function Exception because OI 32-11 prescribes a specific course of conduct. The Government argues that OI 32-11 was neither mandatory nor specific enough to be considered a prescription under step one of the Discretionary Function Exception. The Government argues that OI 32-11 is an aspirational document, not mandatory directive, because it presented personnel with options on how to respond to hangar discharges of AFFF.[2, 3]

"[T]he discretionary function exception will not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. When a mandatory policy exists, "the employee has no rightful option but to adhere to the directive." *Id.* "Not all regulations satisfy this standard; indeed, in order to preclude the government from availing itself of the discretionary function exception, a directive must be 'mandatory it and it must clearly and specifically define what the employees are supposed to do.'"

---

[2] The Government spent some of its briefing and time at oral argument arguing that OI 32-11 did not have anything to do with PFAS contamination and it only existed to (1) protect the operation of the WWTP due to AFFF's foaming characteristics and (2) keep visible foam from being discharged to North Playa Lake. The Government did not cite any authority stating the rationale behind an alleged mandatory policy must coincide with the alleged injury. Accordingly, the Court finds the purpose of OI 32-11 irrelevant to its Discretionary Function Exception analysis.

[3] The Government also spent time at oral argument arguing that total compliance with OI 32-11 would not have prevented the PFAS contamination because even if CAFB adhered to OI 32-11 the AFFF and PFAS would have still ultimately ended up in North Playa Lake. The Government argued that complying with the OI meant the AFFF would have been metered to the WWTP to prevent foaming or personnel would have used additional chemicals called "stop foam" to prevent foaming and that neither of these steps would have prevented the PFAS contamination. The Court finds that these arguments are related to causation for the liability stage of the litigation and similarly finds them irrelevant to its Discretionary Function Exception analysis.

*Loughlin v. United States*, 286 F.Supp.2d 1, 8 (D.D.C. 2003) (quoting *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799 (8th Cir. 1993). "A general directive that leaves implementation decisions in the hands of federal officials is not sufficient; instead, only those 'regulations that give no options to a government agency take away the exercise of discretion.'" *Loughlin*, 286 F.Supp.2d at 8 (quoting *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997); *accord Pieper v. United States*, 713 Fed.App'x. 137, 140 (4th Cir. 2017) (stating that duties imposed at a high level of generality do not remove the Government's discretion); *Kelly v. United States* 241 F.3d 755, 761 (9th Cir. 2001) (stating that broad mandates that do not specify a particular course of conduct do not remove discretion); *C.R.S.*, 11 F.3d at 800-01 (finding no liability where those charged with implementing a mandatory requirement were given wide latitude regarding its execution.).

The language of OI 32-11, the context in which OI 32-11 was issued, and an Air Force Instruction regarding the Air Force Publishing System all show that CAFB's conduct was bound by OI 32-11.

The CAFB Commander issued OI 32-11 to "establish policy and guidance associated with the release of AFFF" in CAFB's hangars. (Dkt. No. 4851-7 at 124). The OI specifically stated that AFFF "must be kept out of" CAFB's sanitary sewer system." (*Id.*) OI 32-11 also contained a "Decision Matrix" that instructed CAFB personnel how to dispose of AFFF at various hangars. (*Id.* at 128). Dependent on which particular hangar the release occurred, the Decision Matrix instructed the personnel when AFFF hangar releases needed to be discharged onto nearby ramp, when they needed to be kept out of the storm drain inlets and the sanitary sewer system, and when storm drains needed to be blocked while pumping AFFF from floor trenches. (*Id.*) For example, at five of the nine hangars, personnel were instructed to keep AFFF out of the storm drains. (*Id.*) At all nine hangars, however, the Decision Matrix directed personnel to keep AFFF out of the sanitary

sewer unless a mission permitted otherwise. (*Id.*) This language specifically proscribes a course of conduct regarding AFFF disposition and does not involve an element of judgment or choice. Not only was the language in OI 32-11 mandatory, but it was also sufficiently specific because it told CAFB personnel precisely what was prohibited—allowing AFFF to enter the sanitary sewer system.

In addition to the language of OI 32-11, the context in which the instruction was issued shows its mandatory nature. As outlined in detail above, the issuance of OI 32-11 was driven by a series of environmental incidents, institutional resistance, and mounting regulatory pressure to address AFFF contamination. The need for a formal directive emerged because CAFB's water quality manager Mr. Rebman's efforts to prevent AFFF releases through informal guidance and internal communications did not work. This led to the CAFB Commander issuing the OI and charging the flight commanders to enforce it. (*Id.* at 124 ("All personnel are responsible directly to their flight commanders for the enforcement of this OI.")).

Lastly, Air Force Instruction ("AFI") 33-360 shows the mandatory nature of Operating Instructions generally. (Dkt. No. 4851-24 at 19, 22). AFI 33-360 addresses the Air Force Publishing System and provides procedures for creating and publishing the two different categories of Air Force publications, directive and nondirective. (*Id.* at 11, 19). OIs fall under directive publications. (*Id.* at 22). AFI 33-360 describes directive publications as "necessary to meet the requirements of law, safety, security, or other areas where common direction and standardization benefit the Air Force." (*Id.* at 19). "The language used within the individual [directive] publication describes the nature of compliance required." (*Id.*) "Air Force personnel must comply with [directive] publications." (*Id.*)  Based on the descriptions provided in AFI 33-360, OI 32-11 is clearly mandatory and all CAFB personnel were required to comply with it.

The Court finds that OI 32-11 was mandatory and sufficiently specific with respect to AFFF releases in CAFB's hangars. Accordingly, Government violations of OI 32-11 are not protected by the Discretionary Function Exception.

### b. Negligent AFFF Releases

Dairy Plaintiffs argue that their claims related to negligent AFFF releases at CAFB are not barred because negligent releases are not actions susceptible to policy analysis as required by step two of the Discretionary Function Exception.

At step two of the Discretionary Function Exception analysis, the Government action must be susceptible to policy analysis for the exception to apply. *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 858 (4th Cir. 2016). "The purpose of this step in the discretionary function analysis is to prevent second-guessing of government actions based on policy, understanding that the government actors must weigh various policy considerations and make judgments." *Berkovitz*, 486 U.S. at 536-37. "[C]onduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness." *Rich v. U.S.*, 811 F.3d 140, 147 (4th Cir. 2015) (citing *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000)).

As the Supreme Court noted in *Gaubert*, "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7. The Supreme Court explicitly offered the example of a government official negligently driving a car while on official business as a discretionary act that clearly falls outside the Discretionary Function Exception because the negligence in question cannot be said to be based on policy considerations. *Id.*

22

The Second Circuit in *Coulthurst* also noted the difference between policy choices and judgements not grounded in governmental policy. *Coulthurst*, 214 F.3d at 109. In *Coulthurst*, a prisoner was injured when a cable on a weightlifting machine snapped. 214 F.3d at 109. He filed suit contending that prison officials had been negligent in inspecting and maintaining the equipment. *Id.*

The Second Circuit noted there were potentially two types of negligence at issue: negligence in the design of an inspection program for the equipment, and negligence in the actual inspection of the equipment. *Id.* The first type of negligence likely involved matters of public policy, including balancing safety considerations with economic considerations. Thus, it would be protected by the discretionary function exception. *Id.* On the other hand, an inspector's failure to properly inspect the equipment pursuant to an inspection program is a different type of negligence that involves neither judgment nor choice, nor is it grounded in considerations of governmental policy. *Id.* "For example, the official assigned to inspect the machine may in laziness or haste have failed to do the inspection . . . the official may have been distracted or inattentive, and thus failed to notice the frayed cable; or he may have seen the frayed cable but been too lazy to make the repairs or deal with the paperwork involved in reporting the damage." *Id.* These acts, while clearly negligent, do not involve an element of judgment or choice within the meaning of *Gaubert*. *Id.*

Dairy Plaintiffs' challenge is not to the Government's permissive use and disposal of AFFF but rather to a series of AFFF releases caused by carelessness, inattention, and laziness. As noted above, since the early 1990s, CAFB experienced at least forty-five accidental discharges of AFFF, leading to the release of more than 4,500 gallons of AFFF across CAFB. These accidental discharges were due to system malfunctions and operational errors. Notable incidents include four separate hangar activations due to portable generators being started too close to hangars equipped

with AFFF suppression systems; a foam release caused by an individual grabbing onto and breaking an AFFF pipe in an attempt to keep himself from falling off a platform; and a foam release resulting from the accidental closure of the pressure release valve Additionally, some statistics show that over forty percent of activations are caused by human error.

These instances of human error do not involve an element of judgment or choice within the meaning of *Gaubert*. The Government has not articulated any policy considerations in placing a generator to close to the hangar four separate times or in grabbing onto and breaking an AFFF pipe or in accidentally closing a pressure release valve on an AFFF tank. These and similar instances of negligent releases suggest careless inattention and cannot be said to be based on policy considerations. Because no policy considerations would be implicated in such instances, the Government is not shielded by the Discretionary Function Exception for negligent AFFF releases.

## B. CERCLA § 113(h) Jurisdictional Bar

New Mexico brings claims seeking injunctive relief pursuant to NMHWA and RCRA. The Court directed New Mexico to submit a statement setting forth with precision the specific injunctive relief it is seeking. (Dkt. No. 6618). New Mexico, in its response to the order, stated that it requests relief requiring the United States and Air Force to comply with the terms of a December 2018 permit which was issued to CAFB under RCRA and NMHWA. (Dkt. No. 6648 at 2). New Mexico further listed nine items that the Government would need to accomplish to comply with the permit. (*Id.* at 2-6). The nine items include the following:

1. investigation and corrective action, with State input and oversight, for releases of PFAS (including but not limited to PFOA and PFOS) at areas of Cannon that have been designated by the State as solid waste management units ("SWMUs") or areas of concern ("AOCs") in the Permit;

24

2. notification to the State of any newly identified potential SWMUs or AOCs that may be contaminated with PFAS (including but not limited to PFOA and PFOS) and preparation of a Release Assessment Report for said SWMUs and/or AOCs which will allow the State to determine the need for further investigations and/or corrective action at such locations;

3. reinvestigation of sites at Cannon which the Air Force previously closed out ("No Further Remedial Action Planned") because it used a screening value for water of 70 parts per trillion;

4. quarterly sampling of all water wells located within the PFAS groundwater plume emanating from Cannon using EPA Method 1633;

5. use of EPA Methods 1633 and 8327 in all subsequent PFAS sampling and monitoring events at and around Cannon;

6. manage all PFAS-containing waste generated from remedial or corrective action activities as a hazardous waste, and dispose of them at a RCRA Subtitle C permitted facility;

7. either immediately end all use of PFAS-containing AFFF at Cannon, or design, install, and operate a tank and tank system designed to collect and contain PFAS-containing AFFF used in training exercises, fire suppression systems, or emergency operations in a manner that prevents its release into the environment;

8. design, construct, and install public drinking water supply lines for any Curry County residents currently serviced by a private drinking water well located within the PFAS groundwater plume emanating from Cannon, assuming said residents agree to grant access; and

9.  compliance with the terms of an Administrative Compliance Order issued to Cannon on January 7, 2025, regarding a presumptive release of thousands of gallons of PFAS containing AFFF rinsate that occurred at Cannon in July of 2024.

(*Id.*)

The Government argues that New Mexico's injunctive relief claims are jurisdictionally barred by CERCLA Section 113(h) because the claims are a challenge to the Government's CERCLA efforts. For the reasons set forth in this section, the Court finds that New Mexico's claims for injunctive relief are barred at this time and dismisses the claims without prejudice.

### 1.  CERCLA § 113(h)

In 1980, Congress passed the CERCLA to clean up the thousands of abandoned hazardous waste sites across the nation that pose a threat to human health and the environment. 42 U.S.C. §§ 9601-28. CERCLA accomplishes its environmental goals in two ways. First, CERCLA codified a long-standing common law tort doctrine by holding potentially responsible parties ("PRPs") strictly liable for conduct involving hazardous substances. *Id.* § 9607. Second, CERCLA established a Superfund to finance remedial and removal efforts at the contaminated waste sites. *Id.* § 9601.

Congress amended CERCLA in 1986 to include provisions that would reduce litigation over CERCLA remedial and removal efforts. Among these provisions was CERCLA Section 113(h). CERCLA Section 113(h) is titled "timing of review" and provides

> No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section [104] of this title, or to review any order issued under section [106].

42 U.S.C. § 9613(h). "Section 113(h) protects the execution of a CERCLA plan *during its pendency* from lawsuits that might interfere with the expeditious cleanup effort." *McClellan*

*Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995) (emphasis in original). "This result furthers the policy underlying CERCLA by allowing a quick response to serious hazards." *Id.* (citing *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1018-19 (3d Cir. 1991)); *Schalk v. Reilly,* 900 F.2d 1091, 1095 (7th Cir. 1990), *cert. denied Frey v. Reilly*, 498 U.S. 981 (1990) (finding that the purpose of § 113(h) is to ensure that judicial challenges do not unnecessarily delay CERCLA cleanup actions).

To determine whether Section 113(h) bar applies, the Court must determine (a) whether the cleanup efforts at CAFB are being conducted under CERCLA Section 104 and (b) whether New Mexico's claims seeking injunctive relief should be considered "challenges" to the remedial action.

### a.  Cleanup at CAFB

New Mexico argues that Section 113(h) does not apply to the CAFB cleanup because the CAFB cleanups are not being conducted under CERCLA Section 104 but under different authorities, namely CERCLA Section 120 and/or the Defense Environmental Restoration Program ("DERP"). The Government argues that the CAFB cleanup is conducted under CERCLA Section 104 and that CERCLA Section 120 and DERP do not provide a separate source of authority for cleanups but instead create supplemental obligations to authority already conveyed by CERCLA Section 104.

### i.  CERCLA Section 104

CERCLA Section 104 states in broad terms that whenever a hazardous substance or other threatening substance is released into the environment, "the President is authorized to act . . . to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . ." 42 U.S.C. § 9604(a)(1). CERCLA Section 104 contains a clear power granted to

the President to order removal or remedial actions to address the release of hazardous materials.

*Id.*

### ii. DERP

Although the President delegated most of his authority under CERCLA Section 104 to the EPA, he did delegate CERCLA authority to the Secretary of Defense for Department of Defense ("DOD") sites. *Cannon v. Gates*, 538 F.3d 1328, 1333 n.4 (10th Cir. 2008); Executive Order 12580. Pursuant to that authority, the Secretary cleans up DOD sites pursuant to DERP, 10 U.S.C. §§ 2700-08. *Cannon*, 538 F.3d at 1333 n.4.

The DERP statute provides that "[t]he Secretary shall carry out (in accordance with the provisions of this chapter and CERCLA) all response actions with respect to releases of hazardous substances from each . . . facility or site which was under the jurisdiction of the Secretary and owned by, leased to, or otherwise possessed by the United States at the time of actions leading to contamination by hazardous substances." 10 U.S.C. § 2701(c)(1)(B). The statue explicitly requires "the Secretary to undertake action in response to such hazardous waste sites in accordance with CERCLA." *Cannon*, 538 F.3d at 1333 n.4.

Because DERP requires a response in accordance with CERCLA, courts have found that DERP cleanups are actually pursuant to the Presidents' broad authority in CERCLA Section 104 and, as a result, applied § 113(h) to those cases. *E.g.*, *City of Salina v. United States*, No. 10-2298-CM-DJW, 2011 WL 1107107, at *3 (D. Kan. Mar. 25, 2011) ("10 U.S.C. § 2701(c) functions together with CERCLA § 104 . . . ."); *Long Island Pure Water Ltd. v. Cuomo*, 375 F. Supp. 3d 209, 221 (E.D.N.Y. 2019) ("[T]he DERP statue implicates § 104."); *City of Fresno v. United States*, 709 F. Supp. 2d 888, 901 (E.D. Cal. 2010) ("[T]he cleanup is proceeding under E.O. 12580 and the DERP statute, implicating § 104.").

The Court agrees with those Courts and rejects New Mexico's argument that Section 113(h) does not apply to the cleanup actions at CAFB because those actions are allegedly proceeding under DERP.

### iii.    CERCLA § 120

CERCLA Section 120 mandates the development and implementation of a RI/FS by federal agencies that own or operate facilities listed on the national priorities list ("NPL"), which is the priority list of hazardous waste sites eligible for long-term remedial investigation and remedial action financed under the CERCLA Superfund. 42 U.S.C. §§ 9620(e)(1), (2).

If CERCLA Section 120 creates a grant of authority separate from Section 104,[4] then the plain language of Section 113(h) would exempt Section 120 cleanups from its jurisdictional bar. *Fort Ord Toxics Project, Inc. v. California Environmental Protection Agency*, 189 F.3d 828, 843 (9th Cir. 1999). Under Section 120(e)(2), the Administrator of the EPA is granted authority to conduct remedial actions on federal property, and there is no analogous authority under Section 120 for the commencement of removal actions. *Id.* "Thus removal actions on federal property must fall under the general provisions of Section 104." *Id.* (citing 42 U.S.C. § 9604(a)).

Accordingly, "[d]etermining which provision governs a particular cleanup requires a close look at the different types of CERCLA cleanups: removal actions and remedial actions." *Fort Ord*, 189 F.3d at 843.

Removal actions serve as short-term fixes at a site while PRPs undertake further investigation of contamination. 42 U.S.C. § 9601(23). CERCLA defines removal as

---

[4] The Court assumes without deciding that Section 120 creates a grant of authority separate from Section 104. The Court does not decide this question because it finds that the CAFB cleanup actions is a removal action, instead of a remedial action, and Section 120 does not provide authority for the commencement of removal actions.

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

*Id.* Removal actions are typically described as "time sensitive responses to public threats." *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1228 (9th Cir.2005); *see also Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp.*, 38 F.Supp.2d 802, 810 (N.D.Cal.1999) ("Removal refers to short-term action taken to halt the immediate risks posed by hazardous wastes.") (internal citations omitted). This Court has specifically found that RI/FS are removal actions. *R.E. Goodson Construction Co. v. International Paper Co.*, No. 4:02-cv-4184-RBH, 2005 WL 2614927, at *24 (D.S.C. Oct. 13, 2005).

By contrast, remedial actions provide long-term solutions for particular sites. *Id.* § 9601(24). CERCLA define remedial actions as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* Unlike removal actions which are generally seen as short-term actions, "remedial actions are designed to achieve a permanent remedy." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F.Supp.2d 1118, 1155 (C.D.Cal.2003); *see also Exxon Corp. v. Hunt*, 475 U.S. 355, 360, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) (stating remedial actions under CERCLA are "measures to achieve a 'permanent remedy' to a particular hazardous waste problem"); *City of Moses Lake v. United States*, 458 F.Supp.2d 1198, 1212 (E.D.Wash.2006) ("The one consistent thread in the decisions

dealing with whether an action is remedial or removal in nature is that removal actions generally are immediate or interim responses, and remedial actions generally are permanent responses.") (internal quotation marks removed)). A removal action is generally taken before a remedial action. *Advanced Micro Devices,* 38 F.Supp.2d at 810; *see also Fort Ord*, 189 F.3d at 843 ("Removal actions are temporary measures taken to protect against the threat of an immediate release of hazardous substances into the environment, whereas remedial actions are intended as permanent solutions.").

The current cleanup action at CAFB is a "removal action." The Air Force first conducted its preliminary assessment in October 2015 and its site inspections in 2019. These investigations were the first time the Government established the presence of PFOS and PFOA in groundwater at CAFB above the then EPA LHA of 70ppt. Based on these findings, the Air Force determined that a RI/FS was required. The RI/FS began in August 2020, is still underway, and is scheduled to be completed in August 2026. Additionally, the Air Force is implementing pilot studies designed to investigate treatment technologies. All this suggests that the Air Force's actions at CAFB are to assess and evaluate the removal of PFAS from CAFB's groundwater plume. The record does not suggest that the CAFB cleanup actions are intended to be a permanent remedy.

Accordingly, the Court finds that the CAFB cleanup actions is a removal action, instead of a remedial action. Because Section 120 does not provide authority for the commencement of removal actions, the Court finds that the cleanup actions at CAFB are removal actions pursuant to CERCLA Section 104.

### b.   Challenges under CERCLA § 113(h)

New Mexico argues that, even if the Court finds that the CAFB cleanup is being performed under CERCLA Section 104, the injunctive relief it is requesting under RCRA and NMWHA do not constitute a "challenge" under CERCLA § 113(h).

Courts have applied a "broad standard for what constitutes a challenge." *Cannon*, 538 F.3d at 1336. "A suit challenges a remedial action within the meaning of 113(h) if it interferes with the implementation of a CERCLA remedy." *Broward Gardens Tenants Ass'n v. E.P.A.*, 311 F.3d 1066, 1072 (11th Cir. 2002) (citing *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675 (8th Cir. 1998)). Lawsuits qualify as "challenges" under Section 113(h) when they would create the kind of interference with the cleanup plan that Congress sought to avoid with the enactment of Section 113(h). *McClellan*, 47 F.3d at 330; *see also, e.g.*, *Broward*, 311 F.3d at 1072 ("To determine whether a suit interferes with, and thus challenges a cleanup, courts look to see if the relief requested will impact the remedial action selected."); *Cannon*, 538 F.3d at 1335 ("[A] suit challenges a removal action if it interferes with the implementation of a CERCLA remedy because the relief requested will impact the removal action selected."). Courts apply a pragmatic approach when determining what constitutes a challenge to a CERCLA response action under Section 113(h). *Hanford Downwinders Coalition, Inc. v. Dowdle* 841 F.Supp. 1050, 1059 (E.D. Wash. 1993); *see, e.g.*, *Reynolds v. Lujan*, 785 F.Supp. 152, 153 (D.N.M. 1992); *Schalk*, 900 F.2d at 1097.

In some situations, the nature and degree of interference are sufficiently direct and clear that it will be obvious that the suit is a "challenge" barred by Section 113(h). *See, e.g.*, *Boarhead*, 923 F.2d 1011, 1012 (3d Cir. 1991) (concluding that Section 113(h) barred jurisdiction over a request to stay a CERCLA cleanup until EPA conducted a review of the site as required under the

National Historic Preservation Act). In other situations, it may be necessary to assess the nexus between the nature of the suit and the CERCLA cleanup: the more closely related, the clearer it will be that the suit is a "challenge." *McClellan*, 47 F.3d at 330. As the Ninth Circuit explained,

> every action that increases the cost of a cleanup or diverts resources or personnel from it does not thereby become a "challenge" to the cleanup. The enforcement of minimum wage requirements, for example, might increase the cost of a cleanup and even divert personnel from cleanup duties without becoming a challenge to the cleanup. [The plaintiff's RCRA] lawsuit, however, is far more directly related to the goals of the cleanup itself than is the hypothetical minimum wage action. [The plaintiff], for all practical purposes, seeks to improve on the CERCLA cleanup as embodied in the [agreement].

*Id.*; *see also Gen. Elec. Co. v. EPA*, 360 F.3d 188, 194 (D.D.C. 2004) (concluding that pre-enforcement judicial review of a facial constitutional challenge to CERCLA was permissible under Section 113(h), notwithstanding the concern that the challenge, if successful, "would have the effect of hindering or delaying EPA's cleanup of hazardous waste sites").

Specifically, Courts have held that RCRA enforcement actions are challenges under § 113(h). *E.g.*, *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 881 (D.C. Cir. 2014); *but see United States v. Colorado*, 990 F.2d 1565, 1576 (10th Cir. 1993) (allowing Colorado's RCRA enforcement claim to proceed).

Here, New Mexico's RCRA and NMHWA claims are "challenges" under Section 113(h). The requested relief in this case would interfere with the ongoing CERCLA removal action at CAFB. The injunction, according to New Mexico, would require, among other things, the Government to investigate and correct for releases of PFAS; notify the State of PFAS contamination; reinvestigate certain CAFB sites; sample water wells within the CAFB's groundwater plume; and "design, construct, and install public drinking water supply lines for any Curry County residents currently serviced by a private drinking water well located within the

33

PFAS groundwater plume emanating from Cannon." Accordingly, the permit that New Mexico seeks to enforce would alter how the Government monitors and assesses the extent of contamination and could threaten to preempt the Government's ability to choose the best remedial action among the options of remedial methods that will be analyzed in the completed RI/FS.

The Court finds that the New Mexico's claims seeking injunctive relief are challenges under Section 113(h) and therefore dismisses those claims without prejudice.

### 2. Practical Approach and Faithfully Applying CERCLA Policy

The Court's task is to determine what Congress intended when it enacted Section 113(h). Congress enacted Section 113(h) to advance a cleanup now, litigate later philosophy. Additionally, Congress determined that the courts are not the appropriate forum for directing response actions at contamination sites.[5] Given the phenomenal complexity of the task at CAFB and the limited resources of this Court, that determination is a reasonable one.

Accordingly, in addition to the legal analysis above, the Court finds that both pragmatism and congressional intent are best served by dismissing New Mexico's injunctive relief claims without prejudice. The Court could not practically oversee the ongoing $100 million removal action at CAFB while ensuring compliance with New Mexico's detailed permit compliance

---

[5] Judicial review is to be delayed until "all the activities set forth in the Record of Decision for the surface cleanup phase have been completed." H.Conf.Rep. No. 962, 99th Cong., 2d Sess. 224, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3317; *see, e.g.,* H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 81, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2863 ("The section [113] is intended to codify the current position of the Administrator and the Department of Justice with respect to preenforcement review: there is no right of judicial review of the Administrator's selection and implementation of response actions until after the response action [sic] have been completed . . . ."); H.R.Rep. No. 253 (III), 99th Cong., 2d Sess. 22, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3045 ("Therefore, the Judiciary Committee amendment reaffirms that, in the absence of a government enforcement action, judicial review of the selection of a response action should generally be postponed until after the response action is taken.").

demands. Allowing New Mexico's claims to proceed would, by necessity, require the Court to manage and adjudicate disputes between New Mexico and the Government, inevitably delaying cleanup efforts. Such a delay is precisely what Congress sought to prevent with Section 113(h). By declining to exercise jurisdiction over New Mexico's injunctive relief claims, the Court ensures that the Government can efficiently remove and remediate hazardous waste from its land in alignment with CERCLA's core mission—protecting the environment and safeguarding human health.

## IV.    Conclusion

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Government's motion to dismiss. Dairy Plaintiffs' FTCA claims remain as outlined above, and New Mexico's claims seeking injunctive relief are dismissed without prejudice.

<u>s/Richard M. Gergel</u>
Richard Mark Gergel
United States District Judge

February 27, 2025
Charleston, South Carolina